**[16 PAGES]**
WAYNE A. SILVER, Esq. (108135)
333 West El Camino Real, Suite 310
Sunnyvale, California 94087
Email: w_silver@sbcglobal.net
Tel. (408) 720-7007
Fax. (408) 720-7001

Attorney for Defendant,
WILLIAM ROGER ESHELMAN

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>WILLIAM ROGER ESHELMAN,<br><br>　　　Debtor.<br><br>PAUL BENSI, BART FLORENCE, JERRY KALMAR, AND LYLE SETTER, in their capacities as trustees of the STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND; STATIONARY ENGINEERS LOCAL 39 ANNUITY TRUST FUND; AND STATIONARY ENGINEERS LOCAL 39 HEALTH AND WELFARE TRUST FUND,<br><br>　　　Plaintiffs,<br>　v.<br><br>WILLIAM ROGER ESHELMAN,<br><br>　　　Defendant. | Case No. 10-31713-A-7<br>Chapter 7<br><br>Adv. Pro. No. 10-02473-A [Consolidated for all purposes with Adv.Pro.No. 10-02476-A]<br><br>**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**Court:**　Dept. A, Courtroom 28<br>　　　　　Hon. Michael S. McManus<br><br>**Trial Dates**: September 6 – 7, 2012 |

Trial was heard in these consolidated Adversary Proceedings on September 6 and 7, 2012 to determine Defendant and Debtor WILLIAM ROGER ESHELMAN's ("Eshelman") right to discharge a disputed debt owed by AC Service & Design Company ("ACSD") to Plaintiffs STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND, STATIONARY ENGINEERS LOCAL 39 ANNUITY TRUST FUND, and STATIONARY ENGINEERS LOCAL 39 HEALTH

AND WELFARE TRUST FUND (collectively "Trust Funds") and/or STATIONARY ENGINEERS LOCAL 39 INTERNATIONAL UNION OF OPERATING ENGINEERS AFL-CIO ("Engineers Union"), who are collectively referred to as the "Plaintiffs."

The disputed debt arises from allegedly unpaid contributions and an "ERISA[1]" "withdrawal liability" in connection with ACSD's participation as an employer in the Engineers Union and Trust Funds. Plaintiffs challenge Eshelman's right to discharge this disputed debt in their Second Amended Complaint ("SAC") under 11 U.S.C.[2] §523(a)(4) and (6) for defalcation while acting in a fiduciary capacity and/or willful and malicious injury. This matter was fully tried and submitted for decision.

### *Appearances*

Jordan Mazur and Emily Rich of Weinberg, Roger & Rosenfeld appeared on behalf of the Plaintiffs. Wayne A. Silver appeared on behalf of Eshelman.

### *Jurisdiction*

Jurisdiction exists under 28 U.S.C. §1334. Venue is proper under 28 U.S.C. §1409. The District Court for the Eastern District of California has generally referred these matters to the Bankruptcy Court for hearing pursuant to 28 U.S.C. §157 (a) and United States District Court, Eastern District of California General Orders 182 and 223. This is a core proceeding within the meaning of 28 U.S.C. §157 (b) (2) (I) and this Court may enter a final judgment. Plaintiffs have standing to bring this Adversary Proceeding.

### *Operative Pleadings*

(A) SAC, attached as Ex. 3 to the Trial Declaration of Jordan Mazur docketed on September 7, 2012, PACER Docket No. 115 ("Mazur Decl."); offered as Plaintiffs' Trial Exhibit ("Trial Ex.") 14.

(B) Order On Motion To Dismiss Fraud Claims In Second Amended Complaint and Consolidating Adversary Proceedings entered on July 24, 2012 ("July 24, 2012 Order"), (Mazur Decl., Ex. 27 – offered as Trial Ex. 44).

---

[1] The Employee Retirement Income Security Act of 1974 (Pub. L. No. 93-406, codified in part at 29 USC §1002 et seq.), referred to as "ERISA."

[2] 11 U.S.C. §101, et seq. is referred to as the "Bankruptcy Code."

Page - 2
Defendant's Proposed Findings of Fact And Conclusions of Law

(C)     Answer to Second Amended Complaint (Mazur Decl., Ex. 28 – offered as Trial Ex. 45).

## *Findings of Fact*

1.      After dismissal of the First Claim for Relief (Bankruptcy Code §523(a)(2) – Fraud) and all fraud allegations in the Second Claim for Relief (Bankruptcy Code §523(a)(4)) by the July 24, 2012 Order, the remaining allegations in the SAC are the Second Claim for Relief (Bankruptcy Code §523(a)(4)) for defalcation of a fiduciary, and the Third Claim for Relief (Bankruptcy Code §523(a)(6) – damages for willful and malicious injury).

2.      Eshelman is 62 years old and on social security disability. He is a high school graduate and has a degree from San Jose City College in the Air Conditioning Technology Program with a certification in HVAC Technology. [Trial Declaration of William Roger Eshelman docketed on September 7, 2012, PACER Docket No. 117 ("Eshelman Decl."), ¶¶1 - 2]

3.      Eshelman worked at various jobs in the air conditioning industry from 1973 – 1988. These jobs entailed working in the field, dispatching the men, estimating jobs, training employees and customer relations. During this period Eshelman became a member of the Engineers Union" as a traveling field service engineer and the Plumbers Union Local 393 ("Plumbers Union") as a steamfitter and pipefitter.  Eshelman had no role with either of these Unions during this period except as a member and an instructor for the Plumbers Union apprenticeship program. Eshelman had no involvement in union contract negotiations, trust fund contributions, or any other union or trust fund matters. [Eshelman Decl. ¶¶3 – 4]

4.      Eshelman opened ACSD in 1988 as a sole-proprietorship and incorporated it in 1995 as a California corporation. ACSD was a small family business that employed Eshelman's wife Kathy Eshelman ("Kathy"), their son John and daughter-in-law, Sandy. Eshelman was the President and sole shareholder of ACSD, and involved in the day to day operations. His general responsibilities included working on customer jobsites, sales, marketing, customer relations, hiring and training field employees, record keeping and other management related duties. Eshelman worked at ACSD full time. [Eshelman Decl. ¶¶5 – 6; Reporters Transcript of Trial, September 6, 2012 ("Transcript"), p.109:17 – p.110:5]

5. ACSD initially hired plumbers, service mechanics and sheet metal workers doing new construction, remodeling of commercial buildings, and maintenance, service and repair, with skills specific to the air conditioning industry. [Eshelman Decl. ¶7] Eshelman testified ACSD employed between two and twenty people at various times. [Transcript, p.113:9 – 10]

6. On or about June 30, 1990, Eshelman opened AC Service, Inc. ("AC Service") as a California corporation and transferred the ACSD sheet metal operations into AC Service. AC Service was sold in 1992. [Eshelman Decl. ¶8]

7. Kathy began working for ACSD part-time in 1990, and became a full-time employee at ACSD in 1992. Kathy was the operations manager at ACSD. Her duties included accounting, payroll, personnel matters, supervising the office manager and completing monthly reports for the unions after ACSD became a union shop. Once Kathy became a full-time employee at ACSD, Eshelman's job duties were changed to sales, estimating, customer relations and supervising jobs. [Eshelman Decl. ¶¶9 – 11]

8. ACSD was a non-union company until about 1992, when it signed a collective bargaining agreement ("CBA") with the Engineers Union and thereby qualified as an employer within the meaning of the Labor-Management Relations Act of 1947, 29 U.S.C. §151 et seq.

9. At the same time, ACSD also signed a "Letter of Understanding" [Trial Ex. 48, p.512 – 513] that allowed ACSD employees that were not members of the Engineers Union to participate in the Engineers' Union health plan through the Health and Welfare Trust Fund. [Transcript, p.55:7 – 12] Eshelman was told by Bob Hydron of the Engineers Union however, that Eshelman was not entitled to health benefits because Eshelman was considered the owner or employer. [Eshelman Decl. ¶12; Transcript, p.144:5-23]

10. Each of the respective Trust Funds is governed by a Trust Agreement[3] that requires the employer to make contributions to the Trust Funds and governs the employer's responsibilities to the Trust Funds. When an employer such as ACSD becomes signatory to the CBA, the employer is also bound by the language of those agreements to the Trust Fund Agreements applicable to that

---

[3] A number of these Trust Agreements and Amendments were offered and admitted into evidence without objection. [See Ex. 47, p.2 – 103]

Page - 4
Defendant's Proposed Findings of Fact And Conclusions of Law

employer. [Trial Declaration of Bart Florence docketed on September 7, 2012, PACER Docket No. 116 ("Florence Decl."), ¶¶10 – 11]

11. Eshelman did not recall ever seeing a copy of any of the Trust Fund Agreements at any time prior to April 2, 2008, when the Trust Funds sued ACSD in the District Court in San Francisco for $136,132.72 plus interest and attorneys' fees ("District Court Case"). [Eshelman Decl. ¶¶35, 37] Eshelman was not named as a defendant in the District Court Case.

12. Nobody from the Engineers Union or the Trust Funds ever discussed or explained the Trust Fund Agreements to Eshelman. The Trust Fund Agreements were not attached to or included with any of the CBA's that Eshelman signed. Eshelman never saw any of the Amendments to the Trust Fund Agreements at any time prior to the District Court Case. [Eshelman Decl. ¶37]

13. ACSD periodically renewed the CBA's[4] from 1992 to 2008. ACSD also signed CBA's with the Plumbers Union as well as the Local 104 of the Sheet Metal Workers Union. As customer jobs would come up, Eshelman would assign the employee most qualified based on his particular skill set, regardless of union affiliation. Eshelman believed he was permitted to make this selection under the CBA. [Eshelman Decl. ¶13; See for example Exhibit 47, p. 109[5], CBA for November 1, 2004 – October 31, 2008 which provides in Section 9 that: "*Employer has the sole right to determine which of the employees (regardless of Union affiliation) shall be assigned or dispatched to specific service work.*"]

14. Coverage under the Health & Welfare Fund consists of full coverage for the employee, spouse, and all eligible dependents. [Florence Decl., ¶25]

15. When Kathy became a full time employee at ACSD, she signed up for health benefits from the Engineers Union, and added Eshelman as her dependent. The Engineers Union and/or Trust Funds were notified of this as part of the ACSD ordinary business practice when the forms were submitted. [Eshelman Decl. ¶14]

---

[4] A number of these CBA's were offered and admitted into evidence without objection covering the period 1992 – 2008. [See Ex. 47, p.104 – 141; Ex.48, p.37 – p.57; p.67 – 82; p.95 – 112; Ex.49, p.36 - 52] Letters of Understanding were signed each time a CBA was renewed.

[5] There are several instances of page numbers on Plaintiffs' exhibits. The Court will refer to the page numbers on the very bottom of each page, styled "- XX-".

1       16.     Throughout the period covered by the CBA's, ACSD prepared and submitted timely

2 monthly reports to the Engineers Union regarding contributions for employee benefits to the Trust

3 Funds. Kathy completed and submitted these monthly reports to the Engineers Union starting in

4 about 1992. [Eshelman Decl. ¶15; Transcript, p.110:6 – p.111:3]

5       17.     Since signing the CBA's, auditors from the Engineers Union and Trust Funds have

6 had full and unfettered access to all ACSD records, and conducted detailed and extensive audits of

7 ACSD records including all payroll records. These audits were done every three – four years.

8 Eshelman was present on and off during these audits, which usually lasted a few days. Eshelman

9 made sure the auditors had a comfortable place to work and access to all ACSD records they

10 requested. Eshelman never had an auditor from the Engineers Union or Trust Funds complain they

11 were denied access to any ACSD records. [Eshelman Decl. ¶16]

12       18.     Compliance Audit Services ("CAS") conducted an audit of ACSD's contributions to

13 the Trust Funds in 2003 ("1999 – 2002 Audit"). CAS was provided every opportunity to conduct a

14 full and complete audit of ACSD. [Eshelman Decl. ¶17]

15       19.     Eshelman received a letter, dated March 25, 2003, from the Engineers Union, stating

16 that as a result of the CAS audit, ACSD owed approximately $2,543.70 for the employee liability of

17 Allen Welch. [Eshelman Exhibit "A" received in evidence.] Eshelman took comfort from this letter

18 that ACSD was properly reporting and in compliance with its obligations under the CBA and various

19 Trust Fund Agreements and Amendments. [Eshelman Decl. ¶18]

20       20.     On April 13, 2003, Eshelman received a second letter from the Local 39 again

21 demanding only $2,567.05, which included accrued interest and collection costs. [Eshelman Exhibit

22 "B" received in evidence.] This letter reinforced Eshelman's belief that all was well with the

23 Engineers Union and Trust Funds, as it did not reveal any amounts due and owing for contributions

24 not paid on behalf of Eshelman or Kathy. [Eshelman Decl. ¶¶19 – 20]

25       21.     The amount owed from the 1999-2002 audit was paid in full by ACSD. [Eshelman

26 Decl. ¶21]

27       22.     Eshelman retired from his full-time employment at ACSD in 2003 due to health

28 reasons. Thereafter his job duties were limited to working in our home – office, handling customer

relations, and estimating sales; he could no longer work in the field. Eshelman Decl. ¶22]

23. On February 4, 2004 Kathy submitted a change of address form to the Engineers Union. Eshelman was still listed as Kathy's dependent on this form, a redacted copy of which was received in evidence as Eshelman's Exhibit "C". [Eshelman Decl. ¶23]

24. In July, 2006 ACSD hired Jim Geist as a salaried salesperson. Eshelman knew Jim Geist through his wife Cherin. [Eshelman Decl. ¶24]

25. Shortly after ACSD hired Geist, Cherin became ill with a serious medical condition. Eshelman had no knowledge Cherin was ill at the time ACSD hired Geist. [Eshelman Decl. ¶25]

26. Eshelman called the Trust Funds to find out about Cherin's medical coverage. During this call, Eshelman was told by Mike Schumacher ("Schumacher"), a fund manager for the Trust Funds, that ACSD had to fire Jim Geist. [Eshelman Decl. ¶26]

27. Eshelman told Schumacher that he refused to have ACSD fire Jim Geist, in response to which Schumacher stated he was going to "come down there and take me [Eshelman] out." [Eshelman Decl. ¶27]

28. Shortly after the threat by Schumacher in 2006, Schumacher sent an email on September 13, 2006 to Kyle S. Whittemore ("Whittemore), a senior manager at Lindquist LLP ("Lindquist"), demanding an audit of ACSD because of Geist. [Ex. 51]

29. ACSD received a letter dated September 15, 2006 that another audit was to be conducted by Lindquist to determine what, if any, contributions were owed to the Trust Funds from 2003 – 2006. [Eshelman Decl. ¶28; Exhibit "D"]

30. On October 3, 2006 however, ACSD received a second notification from Lindquist LLP that the scope of the audit had been expanded to cover 1999 – 2006 (the "2006 audit"). A copy of this October 3, 2006 letter is in evidence as Exhibit 47, p.320. [Eshelman Decl. ¶28; Transcript, p.177:3 – p.178:8]

31. ACSD received no explanation from the Engineers Union or Trust Funds as to why a second audit covering the 1999 – 2002 time period was conducted and/or required. [Eshelman Decl. ¶29] Plaintiffs offered the testimony of Kyle Whittemore ("Whittemore"), a partner with Lindquist, who testified the prior audit did not properly pick up "this issue". [Transcript, p.178:9 – 21]

32. Eshelman was never informed by any representative of the Engineers Union or the Trust Funds that the forms ACSD had submitted were inadequate or inaccurate prior to the 2006 audit. [Eshelman Decl. ¶30]

33. Sometime in early 2007 ACSD was notified by the Trust Funds the 2006 Audit reported that ACSD owed $136,132.72. [Eshelman Decl. ¶31] The 2006 Audit Report was admitted over Eshelman's continuing objection. [Exhibit 47, p.142 – p.152]

34. Eshelman wrote to the Trust Funds on April 10, 2007, and responded to the so called "discrepancies" in the 2006 Audit Report. A copy of Eshelman's April 10, 2007 letter was received in evidence as Eshelman's Exhibit "E". [Eshelman Decl. ¶¶31 – 32]

35. The reference to in the 2006 Audit Report about the "probation" issue concern ACSD's employment policy of not offering fringe benefits to new hires during a ninety (90) day initial probationary period. Eshelman believed that was appropriate under the CBA and was advised by Jim Mason of the Engineers Union that this practice was acceptable. [Eshelman Decl. ¶33]

36. In late 2007 the Trust Funds amended the Trust Agreements to add the following language:

    A. **Effective October 1, 2007**, Article I, Section 11 is amended as follows:

    1.08    The term "Contribution" means any contribution made or to be made to the Fund by an Individual Employer under the provisions of the Collective Bargaining Agreement. **All contributions, including unpaid contributions, are vested assets of the Trust Fund that vest prior to actual transfer from Employer to the Fund.**

[See Exhibit 47, p. 63 – 64, Amendment No. 6 To The Trust Agreement Establishing The Welfare Fund of Stationary Engineers Local 39, emphasis added.]

37. Prior to the Amendment effective October 1, 2007, the Trust Agreements contained the following language with respect to "Contributions":

    "The term "Contribution" means any contribution made or to be made to the fund by an Individual Employer under the provisions of a Collective Bargaining Agreement."

[Exhibit 47, p. 38, Section 11 of the Trust Agreement Establishing The Stationary Engineers Welfare Fund]

Page - 8
Defendant's Proposed Findings of Fact And Conclusions of Law

38. Plaintiff's witness Bart Florence testified this change to the definition of a "contribution" was in the nature of a clarification [Transcript, p.45:18 – p.47:12; p.60:12 – p.62:6].

39. On February 6, 2008 ACSD received a letter from the attorneys for the Trust Funds that it had to either pay $136,132.72 within fifteen (15) business days of the letter or a lawsuit would be filed. The District Court Case was filed on April 2, 2008 wherein the Trust Funds sued ACSD in for $136,132.72 plus interest and attorneys' fees. [Eshelman Decl. ¶¶34 – 35]

40. The Trust Funds obtained an Order Denying Cross Motions for Summary Judgment in the District Court Case docketed on February 4, 2009 that awarded unpaid contributions totaling $34,755.55, comprised of $10,012.97 to the Health & Welfare Fund, $7,508.75 to the Pension Fund, $3,354.60 to the Annuity Fund, and another underpayment of $13,879.18 ("District Court Order"), attached to the SAC as Exhibit "D", and offered as Trial Ex. 6.

41. ACSD filed a Chapter 7 bankruptcy on March 30, 2009 in the San Jose Division of the U.S. Bankruptcy Court for the Northern District of California, Case No. 09-52254. [Eshelman Decl. ¶36] Eshelman testified that ACSD was forced out of business by the Engineer's Union. [Transcript, p.114:17 – 20]

42. Eshelman believed all of the actions that he took in connection with the Engineers Union CBA and Trust Agreements were either expressly permitted or subsequently approved. Eshelman Decl. ¶39]

43. All funds ACSD withheld from its employees paychecks with respect to the Engineers Union and Trust Funds were always paid over to the Engineers Union and Trust Funds.

44. There was no evidence offered that Eshelman was a named fiduciary.

45. There was no evidence offered that the ACSD board of directors was a named fiduciary.

46. There was no evidence offered that Eshelman had any authority over Trust Fund assets.

47. There is no evidence offered of an allocation of fiduciary responsibilities or a provision for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under ERISA §1105(c)(1).

*Conclusions of Law*

1. The burden of proof in nondischargeability cases is by a preponderance of evidence. [*Grogan v. Garner*, 498 U. S. 279, 289, 111 S. Ct. 654, 651 (1991)]

2. Exceptions to discharge are strictly construed against an objecting creditor and in favor of the bankruptcy debtor to effectuate the Bankruptcy Code's fundamental policy that honest debtors are entitled to a fresh start. [*In re Riso*, 978 F.2d 1151, 1154 (9th Cir. 1992)]

§523(a)(4) - Defalcation While Acting In A Fiduciary Capacity

3. To except a debt from discharge under Bankruptcy Code §523(a)(4) Plaintiffs must show Eshelman was acting in a fiduciary capacity, and while acting in that capacity engaged in fraud or defalcation. [*In re Bugna*, 33 F.3d 1054, 1057 (9th Cir. 1994); *In re Stanifer,* 236 B.R. 709, 713 (9th Cir.BAP, 1999)]

4. Whether a relationship is fiduciary is a question of federal law and is construed to apply only to express trust relationships. [*Stanifer*, Id. at 713; *In re Cantrell*, 329 F.3d 1119, 1125 (9th Cir. 2003)] The broad, general definition of "fiduciary" is inapplicable in the dischargeability context. [*Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986)] Instead, the fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt. *Id.* It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*. He must have been a trustee before the wrong and without reference thereto. [*In re Lewis*, 97 F.3d 1182, 1185 (9th Cir. 1996); *Banks v. Gill Distrib. Ctrs., Inc.*, 263 F.3d 862 (9th Cir. 2001)]

5. A fiduciary capacity can arise by state or federal statute. A statutory fiduciary is considered a fiduciary for purposes of Bankruptcy Code §523(a)(4) if the statute "(1) defines the trust res; (2) identifies the fiduciary's fund management duties; and (3) imposes obligations on the fiduciary prior to the alleged wrongdoing." [*In re Hemmeter,* 242 F.3d 1186, 1190 (9th Cir.2001)]

6. The Ninth Circuit's decision in *Hemmeter* held ERISA satisfies the traditional requirements for a statutory fiduciary to qualify as a fiduciary under Bankruptcy Code §523(a)(4). In *Hemmeter* however, the corporate officer, although not individually named as a fiduciary, was a member of the employer's board of directors, which was a named fiduciary to the plan at issue.

1  *Hemmeter* therefore involved the named fiduciaries of a 401k plan, and is distinguishable from the
2  case before this Court.
3      7.    Under ERISA, "[a] person is a fiduciary with respect to a plan to the extent (i) he
4  exercises any discretionary authority or discretionary control respecting management or disposition
5  of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the
6  administration of such plan." ERISA §1002(21)(A). This definition is viewed "not in terms of formal
7  trusteeship, but in functional terms of control and authority over the plan." [*See Mertens v. Hewitt*
8  *Assocs.*, 508 U.S. 248, 262, 113 S. Ct. 2063 (1993)]
9      8.    Eshelman is not an ERISA fiduciary under ERISA §1002(21) by virtue of his
10 contractual obligation to report and/or contribute to the Trust Funds, or because of his failure to pay
11 the withdrawal liability. Nor is their evidence in the record of an allocation of fiduciary
12 responsibilities or a provision for named fiduciaries to designate persons other than named
13 fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan
14 under ERISA §1105(c)(1).
15     9.    Eshelman was not a named fiduciary or vested with any "fund management duties"
16 under the Trust Agreements or any of the Amendments thereto, one of the requirements for finding
17 that a statutory fiduciary qualifies as a fiduciary under Bankruptcy Code §523(a)(4). [*Hemmeter*, Id.
18 at 1190]
19     10.    Employer contributions generally do not become plan assets until the employer pays
20 them over to the plan, even when the employer is also a plan fiduciary. **[***Cline v. Indus. Maint.*
21 *Eng'g & Contracting Co.*, 200 F.3d 1223, 1234 (9th Cir. 2000)]
22     11.    Some courts recognize an exception to the general rule in *Cline* that unpaid employer
23 contributions are not assets of a trust fund "**unless** the agreement between the fund and the employer
24 **specifically and clearly declares otherwise**.'" [*In re Brobeck, Phleger & Harrison, LLP*,
25 ("*Brobeck*") 414 B.R. 627, 636 (Bankr. N.D. Cal. 2009), emphasis added.]
26     12.    The operative language in the Trust Agreements prior to October 1, 2007 referenced
27 in Finding of Fact No. 37 and applicable to ACSD's unpaid contributions alleged in the SAC, did not
28 specifically and clearly declare otherwise; that is it did not specifically and clearly state that ACSD's

Defendant's Proposed Findings of Fact And Conclusions of Law

unpaid contributions were assets of the Trust Funds, and was ambiguous on that point. It therefore failed to meet the *Cline* exception as set forth in *Brobeck*.

13. The Amendment to the Trust Agreements effective October, 2007 referenced in Finding of Fact No. 36 supports an inference that the Engineers Union and Trust Funds recognized the prior language in the Trust Agreements was ambiguous as to whether ACSD's unpaid contributions are assets of the Trust Funds. This Amendment does not apply to any unpaid contributions prior to October, 2007, and none are alleged in the SAC with the exception of the ERISA withdrawal liability.

14. This Court concludes any unpaid contributions owed by ACSD were not assets of the Trust Funds. Consequently, Eshelman was not acting as a fiduciary over an identifiable trust res, and his obligations to the Engineers Union and/or the Trust Funds, if any, are not non-dischargeable under Bankruptcy Code §523(a)(4).

15. The Court makes no decision on whether the language as amended after October, 2007 is sufficiently specific and definite to fit within the *Cline* exception as to unpaid employer contributions.

16. Bankruptcy Code §523(a)(4) excepts from an individual debtor's chapter 7 discharge a debt for defalcation while acting in a fiduciary capacity. [*Banks v. Gill Distrib. Ctrs., Inc.*, 263 F.3d 862, 870 (9th Cir. 2001)] The essence of defalcation in the context of Bankruptcy Code is a failure to produce funds entrusted to a fiduciary. [*Quaif v. Johnson*, 4 F.3d 950, 955 (11th Cir. 1993); *Hemmeter,* 242 F.3d at 119] It is undisputed that Plaintiffs never entrusted anything to Eshelman.

17. A "res" must be in existence *before* the designated "fiduciary" relationship truly arises. In this case, the only "res" there may have been arose only *after* the amount of the required payment was determined. Eshelman therefore did not defalcate with respect to any of Plaintiffs' funds or property.

### Bankruptcy Code §523(a)(6) – Willful And Malicious Injury

18. According to the United States Supreme Court, the willful requirement of Bankruptcy Code §523(a)(6) "modifies the word injury, indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional act that leads to injury." [*Kawaauhau v.*

1  *Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 977, 140 L.Ed.2d 90, 95 (1998); see also *Ormsby v. First*
2  *American*, 591 F.3d 1199 (9th Cir. 2010)]

3    19.    Plaintiffs must prove the "willful injury" requirement by demonstrating Eshelman
4  either had a subjective motive to inflict the injury, or believed the injury was substantially certain to
5  occur as a result of Eshelman's conduct. [*In re Jercich*, 238 F.3d 1202, 1208, (9th Cir. 2001)] The
6  Court concludes that neither situation exists here.

7    20.    Eshelman believed he was acting within the bounds of the CBA by not making
8  contributions for himself as Kathy's spouse, and was unaware of the language in the Trust
9  Agreements and Amendments. Eshelman was reassured by and relied on the findings of the 1999 –
10  2002 Audit.

11    21.    In addition, this Court will note the Circuits were split as to whether a sole
12  shareholder or working owner of a business could qualify as a participant in an ERISA employee
13  benefit plan until 2004, when the U.S. Supreme Court decided *Raymond B. Yates, M.D., P.C. Profit*
14  *Sharing Plan v. Hendon*, 541 U.S. 1, 21 (2004), a decision in which Justice Ginsburg pointed out the
15  definitions of "employee" and "participant" provided by the ERISA statute are "completely circular"
16  and "explain nothing."

17    22.    Consequently, Eshelman never acted with either the subjective intent to harm or the
18  subjective belief his conduct was substantially certain to cause harm.

19    23.    Bankruptcy Code §523(a)(6) also requires a separate finding of a "malicious injury"
20  that involves "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4)
21  is done without just cause or excuse." [*Su*, Id. at 1146-47 (quoting *Jercich*, 238 F.3d at 1209). *See*,
22  e.g., *Diamond v. Kolcum (In re Diamond)*, 285 F.3d 822, 829 (9th Cir.2002)]

23    24.    Plaintiffs offer no evidence that either ACSD or Eshelman knew they owed the
24  contributions and/or withdrawal liability, had the clear ability to pay, yet despite this knowledge
25  chose to use these funds for their own benefit; there is no proof of a malicious injury.

26                    Failure of Proof - Damages

27    25.    Plaintiffs failed to prove damages against ACSD. The alternate direct testimony of
28  Bart Florence confirms this, by offering proof of damages "*in an unknown amount to be proven*,

Page - 13
Defendant's Proposed Findings of Fact And Conclusions of Law

amounting to at least $164,859.97 for delinquent contributions between January 1, 1999 and September 30 2006, plus interest, auditors' fees, liquidated damages, costs, and attorneys' fees as allowed by the Local 39 Trust Agreement." [Florence Decl., p.3:27 – p. 4:5]. No such proof was offered.

26. Plaintiffs' damages are largely based on the 2006 Audit Report, admitted into evidence over Eshelman's objection. The Court concludes the 2006 Audit Report, although perhaps admissible, is not entitled to any weight because it was entirely based on hearsay offered by Whittemore as a non-expert witness. [See, *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir.1984)] In addition, there is some evidence the 2006 Audit Report was the result of a retaliatory "special" audit and potentially biased. Consequently, the only admissible evidence of damages is the District Court Order awarding damages of $34,755.55 against ACSD.

27. The Multi-employer Pension Plan Amendment Act of 1980 ("MPPAA") amended the Employee Retirement Income Security Act of 1974 ("ERISA"), to impose liability for a share of the unfunded vested benefits of multi-employer defined benefit pension plans on employers who withdraw from such plans. MPPAA was amended by the Pension Protection Act of 2006 ("PPA").

28. No evidence was admitted as to the amount of this ERISA withdrawal liability.

<u>Failure of Proof – Eshelman's Personal Liability For ACSD's Debts</u>

29. ERISA comprehensively regulates private employee pension plans, and requires "employers" to contribute to employee benefit plans in accordance with the terms of collectively bargained agreements. [ERISA §1145] Specifically, "[E]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." Eshelman was not a signatory to the CBA.

30. In defining "employer" under ERISA, courts have reached different results. The Ninth Circuit refused to define "employer" broadly and held corporate officers personally liable only in cases in which the facts warrant a piercing of the corporate veil, citing *Alman v. Danin*, 801 F.2d 1, 4

Defendant's Proposed Findings of Fact And Conclusions of Law

(1st Cir. 1986). [See, *Trs. of the Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 776 (9th Cir.2009)]

31.     No evidence was offered to show that Eshelman was the "alter ego" of ACSD as the signing company, [*Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 387 (2d Cir. 1989)] or Eshelman and ACSD are a "single employer," [*Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 526 (5th Cir. 1982)], or "the interests of the nonsignatory and signatory parties are materially inseparable," [*Hotel Employees & Rest. Employees Int'l Union Welfare Fund v. Gentner*, 50 F.3d 719, 722 (9th Cir. 1995), overruled on other grounds as clarified in *CGI Techs. & Solutions, Inc. v. Rose*, 683 F.3d 1113, 1117 (9th Cir.2012)] There is no evidence that Eshelman falls into any of these categories warranting imposition of personal liability.

Affirmative Defenses – Statute of Limitations

32.     Because ERISA has no explicit statute of limitations to recover fund contributions, federal courts often borrow the most analogous state statute of limitations. [*Felton v. Unisource,* 940 F2d 503, 508 (9th Cir.1991)] In *Wetzel v. Lou Ehlers Cadillac Group Long Term Disability Ins. Program,* 222 F. 3d 643 (9th Cir.2000) (en banc), California courts held that "California's [four-year] statute of limitations for suits on written contracts.... provides the applicable statute of limitations for an ERISA cause of action based on a claim for benefits under a written contractual policy in California." *Id*. at 648.  [*Northern California Retail Clerks Union and Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc*., 906 F.2d 1371, 1372 (9th Cir. 1990)]

33.     The four year statute of limitations begins to run when a plaintiff "knows or has reason to know" of the injury that is the basis of the action. [*Id.* at 1372] The evidence in this case showed the four years statute of limitations began to run when the Plaintiffs had reason to know of the alleged underpayment by ACSD, which was when they conducted the 1999 – 2002 Audit and were given full and unfettered access to all of ACSD's books and records. That was more than four (4) years before the Trust Funds filed the District Court Case on April 2, 2009.

### *Conclusion*

Accordingly, judgment shall be entered in favor of Eshelman against Plaintiffs.

1     To the extent that any portion of a finding of fact contains or constitutes a conclusion of law,
2 such portion shall be deemed to be a conclusion of law, and to the extent that any portion of
3 a conclusion of law contains or constitutes a finding of fact, such portion shall be deemed a finding
4 of fact.

5     Dated: November 5, 2012            Respectfully submitted,

7                                                 /s/ Wayne A. Silver
8                                                Wayne A. Silver, attorney for Defendant
                                               WILLIAM ROGER ESHELMAN