

**FILED**

**MAR 3 1 2015**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

In re

WILLIAM ROBERT ESHELMAN,

    Debtor.

_____

PAUL BENSI, ET AL.,

    Plaintiff,

vs.

WILLIAM ROBERT ESHELMAN,

    Defendant.

_____

Case No. 10-31713-A-7

Adv. No. 10-2473
[Consolidated with 10-2476]

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This proceeding concerns the dischargeability of a debt allegedly owed by defendant and debtor William Roger Eshelman to plaintiffs Stationary Engineers Local 39 Pension Trust Fund, Stationary Engineers Local 39 Annuity Trust Fund, and Stationary Engineers Local 39 Health and Welfare Trust Fund ("Trust Funds"), and Stationary Engineers Local 39 International Union of Operating Engineers AFL-CIO ("Engineers Union").

Case 10-02473    Filed 03/31/15    Doc 164

The alleged debt arises from unpaid employer contributions and a withdrawal liability in connection with AC Service & Design Company's (ACSD) participation as an employer in the Trust Funds. See Employee Retirement Income Security Act (ERISA) of 1974 (Pub. L. No. 93-406, codified at 29 U.S.C. §§ 1002 et seq.). Plaintiffs challenge Eshelman's right to discharge this debt under 11 U.S.C. § 523(a)(4) and (6).

Jurisdiction exists under 28 U.S.C. § 1334. Venue is proper under 28 U.S.C. § 1409. The District Court for the Eastern District of California has referred bankruptcy cases and proceedings to the Bankruptcy Court for hearing pursuant to 28 U.S.C. § 157(a) and United States District Court, Eastern District of California General Orders 182 and 223. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I).

After dismissal of the First Claim for Relief and all fraud allegations in the Second Claim for Relief, the remaining claims in the Second Amended Complaint are for defalcation by a fiduciary, and damages for willful and malicious injury to the plaintiffs' property.

### Findings of Fact

1. Eshelman opened ACSD in 1988 as a sole-proprietorship and incorporated it in 1995. ACSD was a family business that employed Eshelman's wife Kathy Eshelman, their son and daughter-in-law. Eshelman was the President and sole shareholder of ACSD. He was involved in the day to day operations of the business and his general responsibilities included working at job sites, sales, marketing, customer relations, hiring and training

field employees, record keeping, and other management related duties. Eshelman worked at ACSD full time.

2.  ACSD initially hired plumbers, service mechanics, and sheet metal workers doing new construction, remodeling of commercial buildings, and maintenance, service and repair, with skills specific to the air conditioning industry. ACSD employed between two and twenty people at various times.

3.  On or about June 30, 1990, Eshelman opened AC Service, Inc., as a California corporation and transferred the ACSD sheet metal operations into AC Service, Inc. AC Service, Inc., was sold in 1992.

4.  Mrs. Eshelman began working for ACSD part-time in 1990, and became a full-time employee in 1992. Mrs. Eshelman was the operations manager at ACSD. Her duties included accounting, payroll, personnel matters, supervising the office manager, and completing monthly reports for the unions after ACSD became a union shop. Once Mrs. Eshelman became a full-time employee at ACSD, Eshelman's job duties were changed to sales, estimating, customer relations and supervising jobs.

5.  ACSD was a non-union company until about 1992, when it signed a collective bargaining agreement ("CBA") with the Engineers Union.

6.  At the same time, ACSD signed a "Letter of Understanding" that allowed ACSD employees who were not members of the Engineers Union to participate in the Engineers' Union health plan through the Health and Welfare Trust Fund. Eshelman was told, however, that Eshelman was not entitled to health benefits because Eshelman was considered the owner or employer.

7. Each of the respective Trust Funds is governed by a Trust Agreement that requires the employer to make contributions to the Trust Funds and governs the employer's responsibilities to the Trust Funds. When an employer such as ACSD becomes signatory to the CBA, the employer is bound by the language of those agreements to the Trust Fund Agreements applicable to that employer.

8. Eshelman did not recall ever seeing a copy of any of the Trust Fund Agreements at any time prior to April 2, 2008, when the Trust Funds sued ACSD in the U.S. District Court for the Northern District of California for $136,132.72 plus interest and attorneys' fees. Eshelman was not named as a defendant in the district court case.

9. Nobody from the Engineers Union or the Trust Funds ever discussed or explained the Trust Fund Agreements to Eshelman. The Trust Fund Agreements were not attached to or included with any of the CBAs that Eshelman signed.

10. ACSD periodically renewed the CBAs from 1992 to 2008. ACSD also signed CBAs with the Plumbers Union as well as the Local 104 of the Sheet Metal Workers Union. As customer jobs would come up, Eshelman would assign the employee most qualified based on his particular skill set, regardless of union affiliation. Eshelman believed he was permitted to make this selection under the CBA. For example, one CBA effective from November 1, 2004, to October 31, 2008, provided: "Employer has the sole right to determine which of the employees (regardless of Union affiliation) shall be assigned or dispatched to specific service work."

11. Coverage under the Health & Welfare Fund consists of full coverage for the employee, spouse, and all eligible dependents.

12. When Mrs. Eshelman became a full time employee at ACSD, she signed up for health benefits from the Engineers Union, and added Eshelman as her dependent. The Engineers Union was notified of this as part of the ACSD ordinary business practice. Throughout the period covered by the CBAs, ACSD prepared and submitted timely monthly reports to the Engineers Union regarding contributions for employee benefits to the Trust Funds. Mrs. Eshelman completed and submitted these monthly reports to the Engineers Union starting in about 1992.

13. Since signing the CBAs, auditors from the Engineers Union and Trust Funds have had full and unfettered access to all ACSD records, and conducted detailed and extensive audits of ACSD records including all payroll records. These audits were done every three to four years. Eshelman was present during these audits, which usually lasted a few days. Eshelman made sure the auditors had access to all ACSD records they requested.

14. Compliance Audit Services ("CAS") conducted an audit of ACSD's contributions to the Trust Funds in 2003 ("1999 - 2002 Audit").

15. Eshelman received a letter, dated March 25, 2003, from the Engineers Union, stating that as a result of the 1999 - 2002 Audit, ACSD owed approximately $2,543.70 for the employee liability of Allen Welch. Eshelman took comfort from this letter that ACSD was properly reporting and in compliance with its obligations under the CBA and various Trust Fund Agreements and

Amendments.

16. On April 13, 2003, Eshelman received a second letter from the Local 39 again demanding the $2,543.70, with accrued interest and costs. No demand was made for amounts due and owing for contributions not paid on behalf of Eshelman or Mrs. Eshelman.

17. The amount owed from the 1999-2002 audit was paid in full by ACSD.

18. Eshelman retired from his full-time employment at ACSD in 2003 due to health reasons. Thereafter his job duties were limited to working from a home office, handling customer relations, and estimating sales.

19. On February 4, 2004, Mrs. Eshelman submitted a change of address form to the Engineers Union. Eshelman again was listed as Mrs. Eshelman's dependent.

20. In July, 2006 ACSD hired Jim Geist as a salaried salesperson.

21. Shortly after ACSD hired Geist, his spouse became ill with a serious medical condition. Eshelman had no knowledge Geist's spouse was ill at the time ACSD hired Geist.

22. Eshelman called the Trust Funds to find out about the Geists' medical coverage. During this call, Eshelman was told that ACSD had to fire Geist. Eshelman refused to fire Geist. In response, the Trust Fund representative threatened to "come down there and take [Eshelman] out."

23. On or about September 13, 2006, the Trust Fund arranged for Kyle S. Whittemore of Lindquist LLP to audit of ACSD.

24. ACSD received a letter dated September 15, 2006,

informing it that another audit would be conducted by Lindquist to determine what, if any, contributions were owed to the Trust Funds from 2003 - 2006.

25. On October 3, 2006, ACSD received a second notification from Lindquist LLP that the scope of the audit had been expanded to cover 1999 - 2006 (the "2006 audit"). ACSD received no explanation from the Engineers Union or Trust Funds as to why a second audit covering the 1999 - 2002 time period was conducted and/or required.

26. In early 2007 ACSD was notified by the Trust Funds the 2006 Audit revealed that ACSD owed $136,132.72.

27. Eshelman wrote to the Trust Funds on April 10, 2007, disputing the audit findings. The reference in the 2006 Audit Report to the "probation" issue concerns ACSD's employment policy of not offering fringe benefits to new hires during a 90-day initial probationary period. Eshelman believed that was appropriate under the CBA and was advised by a representative of the Engineers Union that this practice was acceptable.

28. In late 2007, the Trust Funds amended the Trust Agreements to add the following language:

> A. Effective October 1, 2007, Article I, Section 11 is amended as follows:
>
> 1.08. The term "Contribution" means any contribution made or to be made to the Fund by an Individual Employer under the provisions of the Collective Bargaining Agreement. All contributions, including unpaid contributions, are vested assets of the Trust Fund that vest prior to actual transfer from Employer to the Fund.

29. Prior to the Amendment effective October 1, 2007, the Trust Agreements contained the following language with respect to

"Contributions":

> The term "Contribution" means any contribution made or to be made to the fund by an Individual Employer under the provisions of a Collective Bargaining Agreement.

30. On February 6, 2008, ACSD received a letter from the Trust Funds' attorneys demanding payment of the $136,132.72 within 15 business days or a lawsuit would be filed. When payment was not made, the district court case was filed on April 2, 2008. Eshelman was not a defendant in the district court case.

31. In the district court case, the Trust Funds obtained an order in connection with motions for summary judgment on February 4, 2009, determining that ACSD owed unpaid contributions totaling $34,755.55, comprised of $10,012.97 to the Health & Welfare Fund, $7,508.75 to the Pension Fund, $3,354.60 to the Annuity Fund, and another underpayment of $13,879.18. However, a judgment was not entered.

32. ACSD filed a Chapter 7 bankruptcy on March 30, 2009 in the San Jose Division of the U.S. Bankruptcy Court for the Northern District of California, Case No. 09-52254.

33. Neither the ACSD board of directors nor Eshelman were named fiduciaries of the Trust Funds.

34. Neither the ACSD board of directors nor Eshelman had any authority over the assets of the Trust Funds, nor is there evidence they were designated to act for named fiduciaries of the Trust Funds.

35. Even though the district court determined that only $34,755.55 of the $136,132.72 demanded against ACSD was owed, the plaintiffs again seek $136,132.72, plus interest, auditor's fees,

...

costs, and attorney's fees from Eshelman. With these additional charges, the demand has increased to $164,859.97.

36. However, the plaintiffs failed to substantiate this or any other amount was due. The only evidence offered was the 2006 audit report. That is, the court was given the conclusion of the auditors but no attempt was made to lay out the data from which the auditor's conclusion was drawn. This is evidence only that an audit was performed. The court must come to its own conclusions regarding the existence of a liability. This required the data behind audit findings, which was not produced. And, to the extent the audit is probative, considering the context in which the audit was performed, it carries no credibility.

37. The Trust Funds also seek payment of an ERISA withdrawal liability. This represents a share of unfunded vested benefits in connection with a multi-employer benefit plan. No convincing evidence was offered by the plaintiffs regarding this liability and how it should be calculated.

Conclusions of Law

1. Assuming the plaintiffs are owed the debts demanded in the second amended complaint, the court concludes they are dischargeable.

2. While the failure to make employer contributions and pay a withdrawal liability may be breaches of the Trust Fund Agreements, even an intentional breach of contract is a dischargeable obligation in bankruptcy. See Lockerby v. Sierra, 535 F.3d 1038 (9th Cir. 2008) and Petralia v. Jercich (In re

Jercich), 238 F.3d 1202, 1205 (9th Cir. 2001). In order for an obligation to be nondischargeable under 11 U.S.C. § 523(a)(6), the debtor must have committed "tortious" conduct.

3. The closest the plaintiffs come to establishing tortious, i.e., willful and malicious, conduct by Eshelman, is the failure to make contributions for his own benefits and his receipt of benefits as a dependent of his spouse.

4. Section 523(a)(6) requires a "malicious injury." This requires "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." Jercich, 238 F.3d at 1209). Here, Eshelman was told he was not entitled to benefits in his own right and when he received benefits through his spouse after she became a full-time employee of ACSD, this was reported regularly to the Trust Funds and was not challenged in the 1999 - 2002 Audit. The court cannot conclude that Eshelman contrived a scheme to obtain benefits without paying for them in knowing violation of the terms of the Trust Agreements, or that he attempted to conceal the fact that he was receiving benefits without paying for them.

5. The plaintiffs also maintain that the ACSD and Eshelman are responsible for unpaid employer contributions in connection with work done by employees who were not members of the unions covered by the plaintiffs' CBAs. Assuming this is so, once again this may be a breach of the Trust Agreements but it is not tortious conduct. The court is unconvinced that Eshelman even understood the agreements to require these payments and then failed to make them.

6. Finally, this is not a case in which an employer has

withheld money from employees for transmittal to the employees' unions and then failed to remit those funds. The contributions in question were owed by ACSD to the Trust Funds.

    7.   The plaintiffs' primary claim is that the alleged debt is made nondischargeable by 11 U.S.C. § 523(a)(4). That is, they maintain that Eshelman cannot discharge the debt because it arises from a "defalcation while acting in a fiduciary capacity. . . ."

    8.   Whether a person is a fiduciary under section 523(a)(4) is a question of federal law. See Ragsdale v. Haller (In re Haller), 780 F.2d 794, 795 (9th Cir. 1986). In this circuit, an ERISA fiduciary is a fiduciary for purposes of section 523(a)(4). See Blyler v. Hemmeter (In re Hemmeter), 242 F.3d 1186, 1190 (9th Cir. 2001).

    9.   As found above, Eshelman was neither named as a fiduciary nor was the ACSD board of director named as a fiduciary of the Trust Funds. Further, they were not designated to act for named fiduciaries of the Trust Funds.

    10.   Despite these findings, it is still possible that Eshelman could be an ERISA fiduciary if he exercised any control over the assets of the benefit plans. A person is a fiduciary for purposes of ERISA "to the extent (i) he exercises any authority or control respecting management or disposition of its assets. . . ." 29 U.S.C. § 1002(21)(A).

    11.   The plaintiffs argue that Eshelman was a fiduciary under ERISA because he exercised control over a plan asset – the unpaid but owing employer contributions and the unpaid withdrawal liability. His failure to cause ACSD to pay these liabilities

therefore was a defalcation by a fiduciary within the meaning of section 523(a)(4).

12. The Ninth Circuit, however, has concluded that plan assets of an ERISA trust do not include future contributions. See <u>Collins v. Pension & Ins. Comm. the S. Cal. Rock Prods. & Ready Mixed Concrete Assns.</u>, 144 F.3d 1279, 1282 (9th Cir. 1998), and <u>Cline v. Industrial Maintenance Eng. & Contr. Co.</u>, 200 F.3d 1223 (9th Cir. 2000). So, even if Eshelman was a fiduciary the failure to pay the contributions and withdrawal liability arguably was not a defalcation.

13. On the other hand, as noted in findings 28 and 29, in this case the parties agreed that future contributions were trust assets. Therefore, the plaintiffs argue that the failure to pay them when they became due made Eshelman a fiduciary and his failure to pay them was a defalcation. This argument is without merit.

14. First, at least as to the unpaid withdrawal liability, assuming one exists, the Ninth Circuit has concluded that a withdrawal liability does not fall within the scope of section 523(a)(4) because it arises only after the employer ceases to have an obligation to contribute to the benefit plan. See <u>Carpenters Pension Trust Fund for Northern California v. Moxley (In re Moxley)</u>, 734 F.3d 864, 869 (9th Cir. 2013).

15. Second, as to the unpaid contributions, assuming there are any, the court conclude that whether or not Eshelman is a fiduciary under ERISA, he is not a fiduciary for purposes of section 523(a)(4). This is because the fiduciary relationship required by section 523(a)(4) must arise before the alleged

-12-

wrongdoing. See Hemmeter, 242 F.3d at 1190. Put differently, the alleged nondischargeable debt "must arise from a breach of trust obligations imposed by law, separate and distinct from any breach of contract." See In re Baird, 114 B.R. 198, 202 (B.A.P. 9th Cir. 1990).

16. In this case, the plaintiffs are arguing that Eshelman became a fiduciary when he failed to pay the contributions (and the withdrawal liability), and the failure to pay these debts was a breach of his duty as a fiduciary. However, because the fiduciary obligation arises from the alleged wrongdoing, Eshelman is not a fiduciary under section 523(a)(4).

17. Third, assuming this court's conclusions in paragraphs 15 and 16 are incorrect by virtue of the language in the trust agreements making future contributions plan assets (see findings in paragraphs 28 and 29 above), the result does not change in this case.[1]

18. This is because of the Supreme Court's decision in Bullock v. BankChampaign, N.A., 133 S.Ct. 1754 (2013). While this decision was issued after the trial of this matter, the parties had the opportunity to brief its implications in post-trial motions.

---

[1] The Ninth Circuit in Moxley discussed an unpublished Eastern District of California District Court case and an out-of-circuit case both determining that a provision in a trust agreement making future benefit contributions plan assets created a fiduciary obligation that existed before the failure to pay those contributions. Hence, these courts concluded that the failure to pay the contributions amounted to a breach of an already existing fiduciary duty. Id. at 869. However, because Moxley did not involve unpaid contributions, only a withdrawal liability, the Ninth Circuit did not reach the issue.

19.  In the Ninth Circuit prior to Bullock, "even innocent acts of failure to fully account for money received in trust" were nondischargeable defalcations. See Hemmeter, at 1190. After Bullock, it is not enough to show that a fiduciary has not accounted for or turned over trust assets. In order for this to be a defalcation within the meaning of section 523(a)(4), the plaintiff also must show intentional wrongdoing by the fiduciary. Bullock, at 1759. There is no record of intentional wrongdoing here. See Conclusions of Law at paragraphs 3-6.

20. Eshelman believed that because probationary and nonunion employees were not entitled to benefits under the funds, that his company owed no contributions to the funds based on their work. He further believed that his own benefits could be received through his spouse. These beliefs were reasonable and in good faith inasmuch as these practices were disclosed to the plaintiffs, ACSD's records reflecting these practices were made available to plaintiffs' auditors, and at least until 2006 audits made no issue of these practices. In these circumstances, the court cannot conclude that Eshelman understood that additional contributions were owed to the plaintiffs' but nonetheless caused other corporate expenses to be paid while not paying the plaintiffs. Cf. Raso v. Fahey (In re Fahey), 494 B.R. 16 (Bankr. D. Mass. 2013) (concluding that paying corporate expenses to the exclusion of obligations owed to ERISA funds was a breach of the duty of loyalty and a defalcation within the meaning of section 523(a)(4)).

21. Finally, the plaintiffs' request to reopen the record to address the Bullock issue is without merit inasmuch as the

complaint pleaded intentional wrongdoing in the context of claims under section 523(a)(2) and (a)(4). These claims were based on the same nucleus of facts as alleged in context of section 523(a)(4). The claim under section 523(a)(2) was dismissed because the alleged fraud was not pleaded with particularity, and the plaintiffs failed to prove the claim under section 523(a)(4) at trial. Nothing was offered suggesting that the defendant's alleged intentional wronging for purposes of section 523(a)(4) was any different than alleged for purposes of sections 523(a)(2) and (a)(6).

Accordingly, the motion to reconsider the court's initial decision will be denied. A separate order and judgment shall be lodged by the defendant.

Dated: Sept. 9, 2013

March 31, 2015

By the Court

_____
Michael S. McManus, Judge
United States Bankruptcy Court

-15-

**CERTIFICATE OF MAILING**

I, Susan C. Cox, in the performance of my duties as a judicial assistant to the Honorable Michael S. McManus, mailed by ordinary mail to each of the parties named below a true copy of the attached document.

Christian L. Raisner
Emily P. Rich
1001 Marina Village Parkway #200
Alameda CA 94501

Wayne A. Silver
333 W El Camino Real #310
Sunnyvale CA 94807

Dated: March 31, 2015

_____
Susan C. Cox
Judicial Assistant to Judge McManus